UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

NAREEN ADUSUMELLI, et al.,

                  Plaintiffs,

    -against-                                 08 Civ. 6932 (RJH)

                                      **MEMORANDUM OPINION**
                                        **AND ORDER**

DAVID STEINER, COMMISSIONER OF
EDUCATION, et al.,

                  Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

ALANNA FARRELL,

                  Plaintiff,

    -against-                                 09 Civ. 4902 (RJH)

NEW YORK STATE DEPARTMENT OF
EDUCATION, et al.,

                  Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Richard J. Holwell, District Judge:

      New York Education Law § 6805(1)(6) provides that "[t]o qualify for a

pharmacist's license, an applicant shall . . . be a United States citizen or an alien lawfully

admitted for permanent residence in the United States."  The phrase "lawfully admitted

for permanent residence" refers to aliens who have obtained their green cards—that is,

aliens who have gained "legal permanent resident" ("LPR") status under federal law.  *See*

8 U.S.C. § 1101(a)(20).  The New York statute excludes all other aliens from the

pharmacy profession, including those who have received authorization from the federal government to work in the United States temporarily.[1]  The question in this case is whether § 6805(1)(6) is unconstitutional because it denies non-LPR aliens equal protection of the laws or because it encroaches upon the exclusive federal power to regulate immigration.

The Supreme Court, relying on both the Equal Protection Clause and the exclusivity of the federal immigration power, has traditionally applied strict scrutiny to strike down state laws that discriminate against aliens.  *See Examining Bd. of Engineers, Architects and Surveyors v. Flores de Otero,* 426 U.S. 572, 602 (1976).  Two United States circuit courts, however, recently distinguished this precedent and upheld state laws discriminating against non-LPR aliens on the theory that alienage classifications are not suspect so long as they do not discriminate against LPRs.  *League of United Latin American Citizens (LULAC) v. Bredesen*, 500 F.3d 523 (6th Cir. 2007); *LeClerc v. Webb*, 419 F.3d 405 (5th Cir. 2005).  The Second Circuit has not decided the issue.

## BACKGROUND

The facts of these consolidated actions are not disputed.  Plaintiffs are twenty-six aliens with temporary authorization from the federal government to work in the United States.  Twenty-two of them obtained visas known as H-1B temporary worker visas, which under the Immigration and Nationality Act may be given to aliens who come "temporarily to the United States to perform services . . . in a specialty occupation . . . ." 8 U.S.C. § 1101(a)(15)(H)(i)(b); Def. 56.1 ¶ 4.  The other four plaintiffs obtained "TN"

---

[1] Similar provisions of the New York Education Law exclude non-LPR aliens from other professions. *See* N.Y. Educ. Law §§ 6524(6) (physicians), 6554(6) (chiropractors), 6604(6) (dentists), 6609(6) (dental hygienists), 6704(6) (veterinarians), 6711(6) (veterinary technicians), 6955(2)(6) (midwives), 7206(6) (engineers), 7206-a(1)(6) (land surveyors), 7324(1)(6) (landscape architects), 7504(1)(6) (certified shorthand reporters), 7804(5) (massage therapists).

temporary worker status, an immigration status created by federal law in accordance with the North American Free Trade Agreement ("NAFTA") that permits admission to "a citizen of Canada or Mexico who seeks temporary entry as a business person to engage in business activities at a professional level . . . ."  8 C.F.R. § 214.6(a).  All twenty-six plaintiffs are pharmacists.  They secured "limited licenses" to practice pharmacy in New York under a previous version of § 6805(1)(6), which permitted a three-year waiver of the citizenship or green card requirement for otherwise qualified pharmacists, plus a one-year extension of that waiver.  (Farrell 56.1 ¶ 14.)  The waiver provision expired in October 2006.  (*Id*. at ¶ 15.)  Though plaintiffs' limited licenses were set to expire by 2009 and are not eligible for renewal (because of the green card requirement), the parties stipulated and the Court ordered that the licenses be extended pending the outcome of this litigation.  (*Id*. at ¶ 19.)  Thus, plaintiffs continue to practice pharmacy in New York, and there is no dispute that they are qualified to do so but for their lack of green cards.  Twenty-four of the twenty-six plaintiffs are licensed to practice pharmacy in other states.  (Adusumelli Mem. at 3.)

Plaintiffs are known in the parlance of immigration law as "nonimmigrant aliens" because they are authorized to stay in the country for only a finite period.  Both H-1B and TN status grant admission to the United States for an initial period of no more than three years.  8 C.F.R. §§ 214.2(h)(9)(iii)(A)(1) (H-1B visa), 214.6(e) (TN status).  Both statuses also permit three-year extensions of this initial period, but an alien may not remain in the country on an H-1B visa for more than a total of six years (in other words, an H-1B visa may only be extended once).  *Id*. at § 214.2(h)(15)(ii)(B)(1).[2]  Despite these

---

[2] TN status, which covers four of the twenty-six plaintiffs, does not impose any limit on the alien's total period of stay.  *Id*. at § 214.6(h)(iii)(iv).

provisions, however, all but two of the plaintiffs have been in the United States for more than six years, and six have been here for more than ten years. (Adusumelli Opp. at 7 n. 8; Adusumelli 56.1 ¶ 20, 49-51, 98, 159-60, 201-02; Farrell 56.1 ¶ 8.) Two patterns of the immigration process for professionals explain this apparent anomaly. First, professional aliens who receive temporary work authorization are often former students who entered the country on student visas, completed their studies at an American university, and then remained to work in the United States as H-1B or TN professionals. (*See, e.g.*, Farrell 56.1 ¶¶ 2-4 (Farrell entered on an F-1 student visa in 1999, received a Doctor of Pharmacy from Howard University in 2005, and subsequently received an H-1B visa to work as a pharmacist at Mount Sinai Hospital).) Second, aliens may apply for green cards while working in the country on nonimmigrant status.[3] Because the green card process is slow and often remains unresolved when an H-1B professional's maximum period of stay expires, the United States issues "Employment Authorization Documents" ("EADs") to extend the work permissions of aliens awaiting green card determinations who are not eligible for further visa extensions. *See* 8 C.F.R. § 274a.12(c)(9). Here, twenty-two plaintiffs have applied for green cards, and sixteen of them have received EADs because they have exhausted the maximum terms of their H-1B visas. (Adusumelli Mem. at 3; Adusumelli 56.1 Response ¶ 4.) Thus, though plaintiffs are technically "nonimmigrants," 8 U.S.C. § 1101(a)(15), most of them intend

---

[3] That H-1B and TN workers can apply for green cards may itself seem anomalous, because these work permissions are meant for aliens who seek to remain in the United States temporarily. 8 U.S.C. § 1101(a)(15)(H)(i)(B) (covering aliens who are "coming *temporarily* to the United States"); 8 C.F.R. § 214.6(a) (covering Canadian and Mexican citizens who seek "temporary entry"). TN applicants must actually "satisfy the inspecting immigration officer that the proposed stay is temporary." *Id.* at § 214.6(b). By the legal fiction of "dual intent," however, H-1B and TN professionals may maintain their temporary status while simultaneously manifesting an intent to remain in the country permanently by applying to become LPRs. *See LeClerc*, 419 F.3d at 429 (Stewart, J., dissenting).

to immigrate and all of them are here in compliance with federal immigration laws and policy.  The Court uses the misnomer only because it is a term of art imbedded in the law, *see Toll v. Moreno*, 458 U.S. 1, 3 (1982), not because it accurately describes plaintiffs' intentions.

Defendants are the Commissioner of Education and the Chancellor of the Board of Regents (collectively, "the State")—the leaders of the two New York agencies responsible for enforcing § 6805(1)(6).[4]  They argue that nonimmigrant aliens are transient as a class and that the statute rationally protects the public from the consequences of this transience:

> Section 6805(1)(6) [furthers] . . . New York's legitimate interest in protecting the health and safety of its residents by monitoring, regulating and enforcing compliance with professional disciplinary rules and ensuring the availability of malpractice actions against pharmacists where appropriate. . . . Persons without permanent ties to the United States are less likely to remain in the state, and [] are therefore less likely to comply with state disciplinary regulations. . . . Likewise, . . . pharmacists without permanent ties to the United States are more likely to locate their assets outside the state and outside the country, making them less available to satisfy judgments in malpractice actions.

(Def. Mem. at 18-19.)

Plaintiffs argue § 6805(1)(6) violates the Equal Protection Clause; unconstitutionally encroaches upon the federal immigration power; conflicts with federal immigration law; violates substantive due process; and violates the right to interstate travel.  They seek a judgment declaring the statute unconstitutional and permanently

---

[4] Though plaintiffs have also named the agencies themselves as defendants, the State argues that the claims against the agencies—the Department of Education and the Board of Regents—are barred by the Eleventh Amendment.  The State is correct, *see United States v. City of Yonkers*, 96 F.3d 600, 619 (2d Cir. 1996) ("To the extent that plaintiffs' claims were asserted against New York State, SED [the State Education Department], and the Board of Regents, . . . those defendants have Eleventh Amendment immunity and hence are not considered to be persons suable under § 1983."), and plaintiffs do not dispute the point.  As the State concedes, however, plaintiffs may state claims for injunctive relief against the Commissioner of Education and the Chancellor of the Board of Regents in their official capacities under the *Ex Parte Young* doctrine.  *See State Employees Bargaining Agent Coalition v. Rowland*, 494 F.3d 71, 95 (2d Cir. 2007).

enjoining the defendants from enforcing it.  The parties filed cross motions for summary

judgment.  Because the Court agrees with plaintiffs' first two arguments, it does not reach

the others.

## DISCUSSION

"State classifications based on alienage are subject to 'strict judicial scrutiny.'"

*Examining Bd. of Engineers, Architects and Surveyors v. Flores de Otero*, 426 U.S. 572,

602 (1976) (quoting *Graham v. Richardson*, 403 U.S. 365, 376 (1971)).  The Supreme

Court established this rule of constitutional law in a line of cases decided between 1971

and 1977 that began with *Graham v. Richardson*.  The Court had struck down state and

local alienage classifications before, *see Yick Wo v. Hopkins*, 118 U.S. 356 (1886)

(municipal ordinance that excluded Chinese aliens from the laundry industry); *Takahashi*

*v. Fish & Game Comm'n*, 334 U.S. 410 (1948) (California law that denied fishing

licenses to aliens not eligible for federal citizenship); *Truax v. Raich*, 239 U.S. 33 (1915)

(Arizona law that required private employers with five or more employees to employ

80% citizens), but not until *Graham* did the Court explain its rationale in the terminology

of modern Constitutional jurisprudence:

> [C]lassifications based on alienage, like those based on nationality or race,
> are inherently suspect and subject to close judicial scrutiny. Aliens as a
> class are a prime example of a 'discrete and insular' minority (*see United
> States v. Carolene Products Co.*, 304 U.S. 144, 152-153, n. 4 (1938)) for
> whom such heightened judicial solicitude is appropriate. Accordingly, it
> was said in *Takahashi* that "the power of a state to apply its laws
> exclusively to its alien inhabitants as a class is confined within narrow
> limits."

403 U.S. at 372.  The *Graham* court applied this principle to declare unconstitutional two

welfare statutes, one that denied benefits to all non-citizens and another that allowed

aliens to receive benefits only if they met a 15-year residency requirement.  *Id*. at 367-69.

In the ensuing six years, the Court struck down four similar alienage classifications: a New York law that excluded non-citizens from a portion of the civil service, *Sugarman v. Dougall*, 413 U.S. 634 (1973); a Connecticut law that made non-citizens ineligible to take the bar exam, *In re Griffiths*, 413 U.S. 717 (1973); a Puerto Rico law that excluded non-citizens from the private practice of engineering, *Flores de Otero*, 426 U.S. at 576; and a New York law that limited public financial aid for higher education to citizens and aliens who had applied for citizenship or who declared an intent to apply when eligible. *Nyquist v. Mauclet*, 432 U.S. 1 (1977). Justice Blackmun authored all of these opinions except *Griffiths*, and he summarized their rationales in *Flores de Otero*:

> The underpinnings of the Court's constitutional decisions defining the circumstances under which state and local governments may favor citizens of this country by denying lawfully admitted aliens equal rights and opportunities have been two. The first, based squarely on the concepts embodied in the Equal Protection Clause of the Fourteenth Amendment and in the Due Process Clause of the Fifth Amendment, recognizes that "(a)liens as a class are a prime example of a 'discrete and insular' minority . . . for whom . . . heightened judicial solicitude is appropriate." *Graham v. Richardson*, 403 U.S. at 372. The second, grounded in the Supremacy Clause, Const., Art. VI, cl. 2, and in the naturalization power, Art. I, s 8, cl. 4, recognizes the Federal Government's primary responsibility in the field of immigration and naturalization.

426 U.S. at 602 (citations omitted). Since *Nyquist*, the Supreme Court has upheld state laws discriminating against aliens only in two distinct circumstances that it has determined warrant lesser scrutiny. First, a state may exclude aliens from "political and governmental functions." *Toll v. Moreno*, 458 U.S. 1, 12 n.17 (1982); *Foley v. Connelie*, 435 U.S. 291, 295-96 (1978) (upholding under rational basis review New York law excluding aliens from police force). Second, states have broad power to deny benefits and opportunities to undocumented aliens, "whose very presence within the United States

is the product of their own unlawful conduct."  *Plyler v. Doe*, 457 U.S. 202, 219 (1982);[5]

*DeCanas v. Bica*, 424 U.S. 351, 356 (1976) (upholding against Naturalization Clause and

Supremacy Clause challenges California statute prohibiting employment of illegal aliens)

("California's attempt . . . to prohibit the knowing employment . . . of persons not entitled

to lawful residence in the United States, let alone to work here, is certainly within the

mainstream of [its] police power regulation.").

     Here, the State does not argue that § 6805(1)(6) falls into either of these

established exceptions; instead the State seeks to distinguish the rule that alienage

classifications draw strict scrutiny on the ground that the rule should only apply to laws

that discriminate against LPRs.  Unlike the *Graham* line of cases—most of which

concerned laws that distinguished between citizens and non-citizens and all of which

concerned statutes that disfavored at least some LPRs—§ 6805(1)(6) draws a slightly

different line by immigration status, one that treats LPRs and citizens alike and places all

other aliens into a disfavored class.  Justice Rehnquist raised this distinction in his dissent

in *Toll v. Moreno*, 458 U.S. 1, 44-45 (1982)—where the majority held that a Maryland

law drawing a similar line between LPRs and other aliens violated the Supremacy

Clause—but no majority of the Court has ever recognized it.[6]  Two circuit courts,

however, recently relied on the LPR distinction to uphold state laws that denied benefits

---

[5] *Plyler* concerned a Texas law that denied free public education to undocumented children.  Though the Court found that illegal aliens are not a suspect class, it nonetheless invalidated the law under a heightened form of rational basis review triggered primarily by the innocence of the affected children.  457 U.S. at 220 ("[L]egislation directing the onus of a parent's misconduct against his children does not comport with fundamental conceptions of justice.").

[6] Justice Rehnquist wrote: "In each case in which the Court has tested state alienage classifications . . . the question has been the extent to which the States could permissibly distinguish between citizens and permanent resident aliens . . . . [T]he need for strict scrutiny simply does not apply to state policies that distinguish between permanent resident aliens and nonimmigrants."  *Id.*

and opportunities to only non-LPR aliens.  *LULAC*, 500 F.3d 523; *LeClerc*, 419 F.3d

405.

   The Court will consider the LPR distinction's relevance to each of Justice

Blackmun's rationales in turn.

   A.   *Equal Protection and the LPR distinction*

   The State's Equal Protection argument turns on differences in the rights and

obligations of LPRs, on the one hand, and nonimmigrant aliens, on the other hand.

According to the State, LPRs "share essential benefits and burdens of citizenship"—they

pay taxes like citizens, they can volunteer for or be conscripted into the military, and they

have authorization to live and work in the country indefinitely—while other aliens

lawfully within the country do not have as much in common with citizens.  (Def. Mem. at

13 (quoting *LeClerc*, 419 F.3d at 415).)  Nonimmigrants like plaintiffs, for example, have

not received permission to remain in the country indefinitely, have different tax

obligations than citizens and LPRs, and generally cannot serve in the military.  The

State's position is that these differences, which evidence a more tenuous connection to

the United States, mean that nonimmigrants and other aliens who have not obtained a

green card have a distinct "constitutional status" that does not warrant strict scrutiny

under the Equal Protection Clause.[7]  Under this theory, state classifications drawn by

---

[7] The first step in any Equal Protection analysis is to determine the applicable level of judicial scrutiny.
That determination turns on whether the law creates a suspect classification or burdens a fundamental right:

   [U]nless the legislature utilizes a classification that is inherently invidious because it
   disadvantages a suspect class, or because it infringes upon the exercise of a fundamental
   right, [courts] exercise only a limited review power over the acts of legislatures.  Under
   this limited review power, we will uphold forms of state action under the Equal
   Protection Clause so long as the classification at issue bears some rational relationship
   to a legitimate state interest.  On the other hand, where a suspect class or a fundamental
   right is at issue in the classification, we apply a more searching form of scrutiny.  Thus,
   the threshold question for any analysis under the Equal Protection Clause is whether the

immigration status are not suspect so long as they group green card holders with citizens in the favored class and discriminate only against non-LPRs.

*LeClerc* and *LULAC* support the State's argument.  In *LeClerc*, a divided Fifth Circuit panel upheld a Louisiana law that barred all aliens except LPRs from taking the state bar exam.  419 F.3d 405 (5th Cir. 2005).  The *LeClerc* court found that Equal Protection only requires strict scrutiny of alienage classifications that differentiate between LPRs and citizens:

> The [Supreme] Court's treatment of resident aliens [] rests upon pragmatic recognition that [permanent] resident aliens are similarly situated to citizens in their economic, social, and civic (as opposed to political) conditions . . . . Like citizens, [permanent] resident aliens may not be deported, are entitled to reside permanently in the United States, may serve, voluntarily or by conscription, in the military, are entitled to state aid benefits, and pay taxes on the same bases as citizens.

*Id*. at 418.  The court reasoned that non-LPRs do not bear the same badges of quasi-citizenship and that laws discriminating against non-LPRs as a class are therefore not suspect.  *Id*.  In *LULAC*, a divided Sixth Circuit panel relied on the reasoning in *LeClerc* to uphold a similar Tennessee law, which rendered non-LPR aliens ineligible to obtain driver's licenses.  500 F.3d at 533-34.

*LeClerc* and *LULAC's* adoption of the LPR distinction has prompted criticism from jurists and commentators.  In both circuit cases, dissenting judges argued that alienage is a suspect classification for reasons that apply to LPRs and nonimmigrants alike.  "[T]he basis for aliens' suspect class designation seems to be premised on aliens'

---

highly deferential rational basis review applies, or instead whether the legislation involves a suspect class or a fundamental right resulting in the application of a stricter form of scrutiny.

*Hayden v. Paterson*, 594 F.3d 150, 169-70 (2d Cir. 2010).  The two forms of heightened scrutiny are (1) strict scrutiny, under which a law will be upheld only if it is "narrowly tailored" to meet "compelling government objectives;" and (2) intermediate scrutiny, which requires that a law be "substantially related" to "important government objectives."  *Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 84 (2000).

inability to vote, and thus their impotence in the political process, and the long history of invidious discrimination against them." *Id.* at 540 (Gilman, J., dissenting) (quoting *LeClerc*, 419 F.3d at 428-29 (Stewart, J., dissenting)).  Judge Gilman's dissent in *LULAC* canvassed a body of commentary leveling similar criticisms at *LeClerc*—namely, that the Supreme Court's alienage jurisprudence has never distinguished between LPRs and other aliens, and that *Graham's* rationale encompasses all legal aliens, including nonimmigrants.  *Id.* at 541 (quoting Recent Cases, *Fifth Circuit Holds That Louisiana Can Prevent Nonimmigrant Aliens From Sitting for the Bar*, 119 Harv. L. Rev. 669, 673-74 (2005) ("[T]he Supreme Court [has] never differentiated equal protection review based on status as an immigrant or a nonimmigrant alien . . . . That nonimmigrant aliens work under a different tax structure, cannot serve in the military, and face mandatory departure from the United States, for example, does not justify offering them less constitutional protection . . . .")).  One year after *LULAC*, Judge Siragusa of the Western District of New York relied on the *LeClerc* and *LULAC* dissents to hold that a New York law barring non-LPR aliens from the practice of veterinary medicine (in other words, the corollary to § 6805(1)(6) for the veterinary profession) violated the Equal Protection Clause.  *Kirk v. New York State Dep't of Ed.*, 562 F. Supp. 2d 405, 411 (2008) ("[C]lassifications based on 'alienage' generally [are] inherently suspect . . . . [T]he Court finds that the challenged statute must be reviewed under the strict scrutiny standard, and that it fails to pass such scrutiny.").

The disagreement over the LPR distinction encompasses two disputed questions.  First, what are the differences between LPRs and nonimmigrant aliens?  And second, do those differences properly distinguish the underpinnings of the doctrine that aliens are a

suspect class?  The first question is factual, but it has generated disagreement

nonetheless.  Both the *LeClerc* and *LULAC* courts relied upon a series of purported

differences between LPRs and nonimmigrants.  *LeClerc* summarized those differences as

follows:

> Nonimmigrant aliens' status is far more constricted than that of resident
> aliens. Nonimmigrant aliens are admitted to the United States only for the
> duration of their status, and on the express condition they have "no
> intention of abandoning" their countries of origin and do not intend to seek
> permanent residence in the United States.  They are admitted, remain, and
> must depart at the discretion of the Attorney General.  Plaintiffs
> acknowledge that nonimmigrant aliens may not serve in the U.S. military,
> are subject to strict employment restrictions, incur differential tax
> treatment, and may be denied federal welfare benefits.

419 F.3d at 418-19.  *LULAC* used a similar formulation:

> Like citizens, [LPRs] pay taxes, support the economy, serve in the armed
> forces, and are entitled to reside permanently in the United States.
> Temporary resident aliens, on the other hand, are admitted to the United
> States only for the duration of their authorized status, are not permitted to
> serve in the U.S. military, are subject to strict employment restrictions,
> incur differential tax treatment, and may be denied federal welfare benefits.

500 F.3d at 533.

As the dissenters noted, aspects of these summaries are misleading.  First,

nonimmigrants like plaintiffs do pay taxes, often on the same terms as citizens and LPRs.

Nonimmigrants are considered U.S. residents for tax purposes so long as they are

"physically present in the U.S. for at least 31 calendar days during the course of the year

and 183 days during the 3 year period that includes the current year and two previous

years immediately before it."  *LeClerc*, 419 F.3d at 427 n.1 (Stewart, J., dissenting)

(citing 26 U.S.C. § 7701(b)).  Many nonimmigrants, including many of the plaintiffs

here, meet this test and accordingly bear the same tax obligations as citizens and LPRs.

(*E.g.*, Farrell 56.1 ¶ 19.)  Those who do not meet the residency test still pay taxes on all

income generated within the U.S., but not on income generated abroad.  *LeClerc*, 419

F.3d at 419 n.45.  Thus, when *LULAC* said that LPRs "pay taxes [and] support the

economy" while nonimmigrants "incur differential tax treatment," what it meant was that

some nonimmigrants do not pay taxes on foreign income.

      The Circuit majorities' descriptions of nonimmigrants' transience are also

inaccurate.  *LeClerc* stated "[n]onimmigrant aliens are admitted to the United States only

for the duration of their status, and on the express condition they have 'no intention of

abandoning' their countries of origin and do not intend to seek permanent residence in the

United States."  419 F.3d at 418-19.  But many nonimmigrants, including many of the

plaintiffs here, are in the process of applying for green cards.  And the nonimmigrant

veterinarian-plaintiff in *Kirk* actually became an LPR by the time the case reached the

Second Circuit, prompting the circuit to vacate the district court's decision for mootness.

No. 08-3683-CV (2d Cir. June 24, 2009) ("We find this appeal to be moot in light of the

United States's grant of permanent legal residency status to Plaintiff.").  Such are the

effects of the State Department's doctrine of dual intent, under which nonimmigrants

may "both express a short term intent to remain in the United States temporarily (so as

not to contravene the requirements of the visa under which they entered) and a long term

intent to remain in the United States permanently (so that they may apply for adjustment

of status)."  *LeClerc*, 419 F.3d at 429 (Stewart, J., dissenting).  Thus, though

nonimmigrants are perhaps more likely than LPRs to leave the United States, the

distinctions between the two immigration statuses are not quite as *LeClerc* and *LULAC*

presented them.  Both LPRs and nonimmigrants have foreign citizenship and might opt to

leave the United States permanently for their country of citizenship in the future.

Similarly, both might remain in the United States permanently—a nonimmigrant by obtaining LPR status, and an LPR by simply exercising his right to permanent residence. The difference between the two statuses (and it is a difference) is that a nonimmigrant may not be able to remain in the United States if he wishes.

As for the other features of nonimmigrant status that the circuit majorities relied upon—ineligibility for military service and certain federal benefits, and limited work permission (in other words, permission to work only in a specified field)—neither the circuits nor defendants here explain how these federally imposed restrictions relate to state policy or otherwise impact the Equal Protection analysis.  *See Takahashi*, 334 U.S. at 419 ("It does not follow . . . that because the United States regulates immigration and naturalization . . . a state can adopt one or more of the same classifications to prevent lawfully admitted aliens within its borders from earning a living in the same way that other state inhabitants earn their living.").  In this Court's view, then, the oft-discussed differences between LPR and nonimmigrant status boil down to one potentially important difference—nonimmigrants have not yet obtained permission to reside in the United States permanently—and a slew of other differences of uncertain relevance (nonimmigrants are barred from the United States military, some of them do not pay taxes on foreign income, they can be denied certain federal benefits, and they are typically admitted for the purpose of practicing a particular profession, like pharmacy).

The remaining question is whether these differences properly distinguish the constitutional rule that alienage-based classifications are suspect under the Equal Protection Clause.  The *Graham* court, by providing only the most limited explanation of why it designated aliens a suspect class, left significant room for disagreement over this

issue.  *Graham* declared aliens a "discrete and insular minority."  But what does it mean to be a discrete and insular minority?  And why do aliens as a class fit that description?  *Graham* did not clarify.  *See Toll*, 458 U.S. at 40 (Rehnquist, J., dissenting) ("Apart from the abbreviated conclusion that 'aliens as a class are a prime example of a discrete and insular minority,' the [*Graham*] Court did not elaborate on the justification for 'heightened judicial solicitude.'") (quoting *Graham*, 403 U.S. at 372).  In *Foley*, Justice Burger suggested that aliens' "discreteness and insularity" derived from their inability to vote, 435 U.S. at 294, and Justice Rehnquist proposed the same theory in his *Toll* dissent.  458 U.S. at 40 ("One could infer that rigorous judicial scrutiny [of alienage classifications] normally was necessary because aliens were barred from asserting their interests in the governmental body responsible for imposing burdens upon them.").  Other opinions suggest aliens are discrete and insular due to the history of invidious discrimination against them.  *See Flores de Otero*, 426 U.S. at 603 (canvassing history of "[o]fficial discrimination against lawfully admitted aliens").

Perhaps the best way to read *Graham*'s use of the hoary phrase, "discrete and insular minority," is as a signifier that denotes a group of criteria for determining the proper scrutiny level under the Equal Protection Clause, rather than a single dispositive rationale.  Justice Brennan proposed this broader reading in *Plyler*:

> Several formulations might explain our treatment of certain classifications as "suspect."  Some classifications are more likely than others to reflect deep-seated prejudice rather than legislative rationality in pursuit of some legitimate objective.  Legislation predicated on such prejudice is easily recognized as incompatible with the constitutional understanding that each person is to be judged individually and is entitled to equal justice under the law.  Classifications treated as suspect tend to be irrelevant to any proper legislative goal.  Finally, certain groups, indeed largely the same groups, have historically been "relegated to such a position of political powerlessness as to command extraordinary protection from the

> majoritarian political process." The experience of our Nation has shown
> that prejudice may manifest itself in the treatment of some groups. Our
> response to that experience is reflected in the Equal Protection Clause of
> the Fourteenth Amendment. Legislation imposing special disabilities upon
> groups disfavored by virtue of circumstances beyond their control
> suggests the kind of "class or caste" treatment that the Fourteenth
> Amendment was designed to abolish.

457 U.S. at 217 n.14. This language touches all the familiar premises for strict scrutiny

under the Equal Protection clause. Such scrutiny is warranted if a legal classification (1)

turns on a characteristic that is generally irrelevant to policy goals and has been the

subject of irrational discrimination in the past; (2) unfairly differentiates people based on

an immutable characteristic or a characteristic "beyond their control;" or (3) disfavors a

politically powerless class.[8] The Court's Equal Protection-alienage jurisprudence builds

on all three of these criteria.

The first scrutiny criterion is the most prevalent. The Supreme Court draws upon

history and context to make a preliminary assessment of the legislature's likely motives

for classifying people by a particular characteristic, and if that preliminary assessment

reveals red flags, the Court applies heightened scrutiny. For example, race is seldom

relevant to policy, and our history reveals examples of legislative enactments motivated

by irrational racial prejudice, so the Court is suspicious of any law that classifies by race.

*See, e.g.*, *Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985) ("[R]ace, alienage,

or national origin . . . are so seldom relevant to the achievement of any legitimate state

---

[8] *See* Erwin Chemerinsky, *Constitutional Law* 672 (3d ed. 2006) ("Several criteria are applied in
determining the level of scrutiny [under the Equal Protection Clause] . . . . [T]he Court has emphasized that
immutable characteristics like race, national origin, gender, and the marital status of one's parents warrant
heightened scrutiny. The notion is that it is unfair to penalize a person for characteristics that the person
did not choose and that the individual cannot change. The Court also considers the ability of the group to
protect itself through the political process . . . . [Finally,] [t]he history of discrimination against the group is
relevant to the Court in determining the relevant level of scrutiny. A related issue is the Court's judgment
concerning the likelihood that the classification reflects prejudice as opposed to a permissible government
purpose.").

interest that laws grounded in such considerations are deemed to reflect prejudice and

antipathy—a view that those in the burdened class are not as worthy or deserving as

others.").  Of course, this explanation portrays the Court as putting the cart before the

horse by considering the likely rationality of a law before deciding how closely to

scrutinize the rationality of the law.  But there is no doubt that the Court does, in fact, use

this method to choose between scrutiny levels.  *See id.*; *Frontiero v. Richardson*, 411

U.S. 677, 684-86 (1973) ("[W]hat differentiates sex from such non-suspect statuses as

intelligence or physical disability, and aligns it with the recognized suspect criteria, is

that the sex characteristic frequently bears no relation to ability to perform or contribute

to society.").  Moreover, the Court's heightened scrutiny of alienage classifications

appears to derive in part from such a preliminary assessment of their likely irrationality:

> By labeling aliens a discrete and insular minority, the Court [concluded]
> . . . that for most legislative purposes there simply are no meaningful
> differences between resident aliens and citizens, so that aliens and citizens
> are persons similarly circumstanced who must be treated alike.  At the
> same time, both common experience and the unhappy history reflected in
> our cases demonstrate that aliens often have been the victims of irrational
> discrimination.  In combination, these factors—disparate treatment
> accorded a class of similarly circumstanced persons who historically have
> been disabled by the prejudice of the majority—[led] the Court to
> conclude that alienage classifications in themselves supply a reason to
> infer antipathy and therefore demand close judicial scrutiny.

*Toll*, 458 U.S. at 20-21 (Blackmun, J., concurring).

The State's argument, as the Court construes it, is that alienage classifications that

discriminate against only non-LPR aliens do not raise the same reds flags or "inferences

of antipathy" because non-LPRs, by virtue of their assumed transience, are not similarly

situated to the rest of the population for policy purposes.  (State Reply at 5 ("[T]emporary

nonimmigrant aliens are not a 'suspect class' because they are different from citizens and

LPRs in critical ways, and it is entirely appropriate for states to take account of these differences.").)  In other words: whereas courts are understandably suspicious of laws distinguishing citizens from LPRs (because those groups are similarly situated), laws that discriminate only against non-LPR aliens should not generate similar suspicion because those laws turn on a rational distinction.[9]

Somewhat persuasively, this argument seeks to tie the LPR distinction to the criteria for determining scrutiny in a way that the *LeClerc* and *LULAC* opinions do not. But the Court is not convinced that the differences between LPRs and nonimmigrants are substantial enough to remove non-LPR classifications from the ambit of judicial suspicion.  First, the Supreme Court has already considered and rejected a state law discriminating against a sub-class of aliens characterized by potential transience.  In *Nyquist*, the Court struck down a New York law that discriminated against LPRs who had not yet applied for citizenship and who did not intend to apply for citizenship once they qualified to do so.  432 U.S. at 10.  Because an LPR must renounce foreign citizenship to become a U.S. citizen, *id*. at 5 n.5, the discrimination reached only those LPRs who refused to declare an intent to sever foreign ties.

The *Nyquist* law and § 6805(1)(6) implicate transience in different ways—the *Nyquist* law by excluding aliens who refused to declare an irrevocable commitment to the United States, and § 6805(1)(6) by excluding aliens whom the federal government may still force to leave after a finite period.  But the point remains: the affected sub-class of aliens in *Nyquist* was distinctly more likely to leave the United States than the unaffected

---

[9] This was Justice Rehnquist's argument also.  *Toll*, 458 U.S. at 44-45 (Rehnquist, J., dissenting) ("Implicit in [*Graham* and other] cases is the judgment that because permanent residents are in so many respects situated similarly to citizens, distinctions between them are to be carefully scrutinized. . . . [That] judgment . . . simply does not apply to  . . . distin[ctions] between permanent resident aliens and nonimmigrants.").

18

remainder of the citizen/LPR population, yet the Supreme Court applied strict scrutiny anyway.

Second, the State's argument addresses only one of the two factors the Supreme Court considers in assessing a law's likely rationality for choice-of-scrutiny purposes. Even if one accepts the premise that nonimmigrants have a higher potential for transience than LPRs and that this fact has policy relevance, no one would argue that nonimmigrant aliens are any less likely to suffer irrational discrimination than their LPR counterparts. Indeed, under the State's reasoning, the opposite is true: because nonimmigrants generally have enjoyed less time to assimilate, they are logically *more likely* to suffer xenophobic animosity.  In other contexts, where a distinguishing characteristic has policy relevance but has also been an axis of irrational discrimination, the Supreme Court has applied other forms of heightened scrutiny.  Gender classifications receive intermediate scrutiny because of this mix of possible policy relevance and bad history:

> [S]keptical scrutiny of official action denying rights or opportunities based on sex responds to volumes of history [of discrimination]. . . . [But] the heightened review standard our precedent establishes does not make sex a proscribed classification.  Supposed "inherent differences" are no longer accepted as a ground for race or national origin classifications.  Physical differences between men and women, however, are enduring: "The two sexes are not fungible; a community made up exclusively of one [sex] is different from a community composed of both."  *Ballard v. United States*, 329 U.S. 187, 193 (1946).

*United States v. Virginia*, 518 U.S. 515, 531-33 (1996).  Under this framework, intermediate scrutiny would seem the lowest possible standard of review for non-LPR classifications, because while such classifications might, in some circumstances, implicate a relevant difference between people, they also implicate a history in which

aliens have been denied rights and opportunities simply because they are aliens.  *See,*

*e.g., Takahashi*, 334 U.S. 410; *Yick Wo*, 118 U.S. 356.[10]

Of course, one might believe that § 6805(1)(6), rather than extending this

unfortunate history, seeks only to further the legitimate purposes the State ascribes to it

here—that is, that the law aims to enhance professional discipline and ensure the

availability of malpractice remedies, and that the categorical exclusion of non-LPRs is

the law's manner of pursuing those objectives.  But judicial suspicion is not misplaced.

New York law also bars non-LPRs from other desirable private occupations in which

transience would not seem to pose the same purported dangers: certified shorthand

reporter, massage therapist, land surveyor, and veterinary technician.  N.Y. Educ. Law §§

---

[10] The terminology of the Supreme Court's gender-equal protection and alienage-equal protection doctrines is difficult to reconcile.  In the gender context, the Court applies intermediate scrutiny based on the conclusion that gender is sometimes relevant to policy.  *Virginia*, 518 U.S. at 533.  This intermediate standard, applied uniformly to all gender classifications, is meant to separate laws based on antiquated conceptions of gender inequality from laws based on rational policy.  *Id*.  In the alienage context, in contrast, the Court does not apply a uniform level of scrutiny, but instead changes its scrutiny depending on the propriety of the legislative premise.  States have a legitimate interest in defining their "democratic political institutions," and also in "withholding [their] beneficence from those whose very presence within the United States is the product of their own unlawful conduct," so alienage classifications geared to further those interests receive only rational basis review.  *Foley*, 435 U.S. at 295; *Plyler*, 457 U.S. at 219.  Justice Rehnquist noted this anomaly of the alienage doctrine, albeit to support a different argument (that alienage classifications should not receive any heightened scrutiny).  *Toll*, 458 U.S. at 41 n.12 (Rehnquist, J., dissenting) ("The Court has recognized that the strength of the State's interest is great when it seeks to exclude aliens from its political processes, but selection of the appropriate level of 'scrutiny' traditionally has depended, not on the nature of the State's interest, but on the nature of the burdened class.  If the Court has eschewed strict scrutiny in the 'political process' cases, it may be because the Court is [] uncomfortable with the categorization of aliens as a suspect class.").

     The differences between the Court's gender and alienage doctrines are in the end of little practical import, because under both frameworks the Court differentiates between permissible policy initiatives, on the one hand, and laws that strike too close to antipathy and irrational discrimination, on the other hand.  But in the alienage context, the Court uses a doctrine of exceptions instead of intermediate scrutiny to accomplish that differentiation.  The State seems to argue that the LPR distinction should create a third categorical exception to the alienage-equal protection doctrine, alongside the *Foley* and *Plyler* exceptions.  But the foundation of the LPR distinction is too shoddy to support a bright categorical distinction.  While an undocumented alien's *ipso facto* violation of federal law marks a stark distinction from other state residents, a nonimmigrant alien's potential transience is based on probabilities—many nonimmigrants, like the plaintiffs here who have lived in this country for more than ten years and are in the process of applying for permanent residence, stay in the United States longer than many LPRs.  The nonimmigrant's potential transience does not carry the patent salience of the *Plyler* and *Foley* distinctions.

6711(6), 7206-a(1)(6), 7504(1)(6), 7804(5).  And not long ago, New York forthrightly argued before the Supreme Court that a State should be able to deny aliens opportunities simply for the purpose of preserving those opportunities for citizens.  *Sugarman*, 413 U.S. at 643-44 ("[A]ppellants argue that a State constitutionally may confine public employment to citizens.  Mr. Justice (then Judge) Cardozo accepted this 'special public interest argument' because of the State's concern with 'the restriction of the resources of the state to the advancement and profit of the members of the state.'") (quoting *People v. Crane*, 214 N.Y. 154, 161 (1915)).  Whatever one thinks of that government purpose— and as the quotation reveals, major voices have endorsed it in the past—the Supreme Court has declared it constitutionally impermissible.  *Id.* at 644.  To apply only rational basis review here would contravene principles of judicial scrutiny by ignoring historical and contextual indications that § 6805(1)(6) in fact seeks to achieve the same impermissible objective by reserving pharmacy jobs for citizens and LPRs.[11]  *See Flores de Otero*, 426 U.S. at 603 ("[Historically] aliens have been restricted from engaging in private enterprises and occupations that are otherwise lawful . . . . It is with respect to this kind of discrimination that the States have had the greatest difficulty in persuading this Court that their interests are substantial and constitutionally permissible, and that the discrimination is necessary for the safeguarding of those interests.").

The non-LPR distinction is even less relevant to the other criteria for heightened scrutiny—fairness and political powerlessness.  The Court's alienage jurisprudence invokes these criteria in tandem.  *See Griffiths*, 413 U.S. at 722 ("Resident aliens, like

---

[11] Before 1982, New York law excluded all aliens from the pharmacy profession, except those aliens who had legally declared an intent to become a citizen.  *See* Act of Apr. 14, 1947, ch. 820, § 6803(1)(h), 1947 N.Y. Laws 2052.  The Legislature broadened the exception to encompass all LPRs in response to the *Graham* line of cases.  *See* Act of Jun. 1, 1982, ch. 133, § 17, 1982 N.Y. Laws 499.

citizens, pay taxes, support the economy, serve in the Armed Forces, and contribute in myriad other ways to our society.  It is appropriate that a State bear a heavy burden when it deprives them of employment opportunities.");[12] *Foley*, 435 U.S. at 294 ("[T]he Court has treated certain restrictions on alienage with 'heightened judicial solicitude,' a treatment deemed necessary since aliens—pending their eligibility for citizenship—have no direct voice in the political processes.") (citation omitted).  The theory is that courts must be wary of state laws that exploit aliens' political powerlessness by denying them the fruits of their societal contributions.  Here, the State does not explain why this theory would apply any less to nonimmigrants, who also work, pay taxes, contribute to society, and have no political voice while they remain in this country.  At one point, the State seems to suggest that non-LPR classifications should not receive strict scrutiny because non-LPRs have a different "constitutional status" by virtue of their weaker ties to the country.  (Def. Br. at 14.)  *LeClerc* makes a similar suggestion.  419 F.3d at 417 ("[N]on-immigrant aliens—who ordinarily stipulate before entry to this country that they have no intention of abandoning their native citizenship, and who enter with no enforceable claim to establishing permanent residence or ties here—need not be accorded the extraordinary protection of strict scrutiny by virtue of their alien status alone.").  But what does it mean to say that nonimmigrants have a different "constitutional status" than LPRs, or that nonimmigrants "need not" be protected to the same extent as LPRs?  The Supreme Court has already established that all aliens, even undocumented aliens, have rights under the

---

[12] The State relies heavily on similar language in *Graham*, but there the Court referenced the similarities between legal alienage and citizenship in the course of *applying* strict scrutiny to reject a legislative justification; the Court did not invoke those similarities as a basis for choosing strict scrutiny review.  403 U.S. at 376 ("The 'justification of limiting expenses [by excluding a class of persons] is particularly inappropriate and unreasonable when the discriminated class consists of aliens.  Aliens like citizens pay taxes and may be called into the armed forces.  Unlike the short-term residents in Shapiro [who were citizens], aliens may live within a state for many years, work in the state and contribute to the economic growth of the state.'") (quoting lower court opinion, 321 F. Supp. 250, 253).

equal protection clause.  *Plyler*, 457 U.S. at 215.  Perhaps the "constitutional status" argument is that nonimmigrants have not earned the protections of strict scrutiny—that they do not deserve "heightened judicial solicitude" because they have not been here long enough.  But the Court's alienage jurisprudence simply does not support that argument.  Non-LPR classifications, like citizenship classifications, deny benefits and opportunities to legal residents with no political voice who contribute to society.  To the extent concerns for fairness and political powerlessness contributed to the application of heightened scrutiny in the *Graham* line of cases, those concerns also favor heightened scrutiny here.

*     *     *

Based on the foregoing considerations, the Court concludes that § 6805(1)(6), by denying non-LPR aliens the opportunity to obtain a pharmacy license, triggers strict or intermediate scrutiny.  The Court need not choose between these levels of heightened scrutiny because § 6805(1)(6) fails them both.  Under intermediate scrutiny, the government bears the burden of proving that the classification serves "important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives."  *Nguyen v. Immigration and Naturalization Service*, 533 U.S. 53, 60-61 (2001) (quoting *Virginia*, 518 U.S. at 533).  Here, the State has argued only that § 6805(1)(6) meets the rational basis test and has not put forth any evidence to show that the law withstands more exacting review; there is no evidence, for example, that transience amongst New York pharmacists threatens public health or that nonimmigrant pharmacists, as a class, are in fact considerably more transient than LPR and citizen pharmacists.  And even if the Court were to forgive this

failure of proof, the State's justification for the law demonstrates by itself that its "discriminatory means" are not "substantially related" to its governmental objectives. The State says it seeks to protect "the health and safety of [New York] residents by monitoring, regulating and enforcing compliance with professional disciplinary rules and ensuring the availability of malpractice actions against pharmacists where appropriate." (Def. Mem. at 18.)  Section 6805(1)(6)'s exclusion of non-LPRs is a legitimate means of pursuing these goals, according to the State, because non-LPRs are more likely to leave the country, and perhaps less likely to have substantial assets in the country, and consumers may therefore have more difficulty recovering against non-LPR pharmacists for malpractice and the State may have more difficulty enforcing disciplinary measures against them.  (*Id*. at 19.)  But the fit between these given legislative purposes and the law's discriminatory device is woefully inexact.  The State purports to ameliorate the dangers posed by transient or judgment-proof pharmacists through a provision aimed at only a tiny subclass of pharmacists, instead of imposing generally applicable insurance or similar malpractice-related requirements upon the entire profession.  As a consequence, the law does nothing to reduce the dangers of transience amongst citizen and LPR pharmacists, while at the same time excluding longtime nonimmigrant residents, many of whom will become LPRs when the federal government processes their pending green card applications.  The question is not close; under any form of heightened scrutiny, § 6805(1)(6) fails.  *See LeClerc*, 419 F.3d at 430 (Stewart, J., dissenting) (arguing that non-LPR alienage classification failed rational basis test); *Kirk*, 562 F. Supp. 2d at 411-12 (same); *see also Flores de Otero*, 426 U.S. at 606 ("[T]he asserted purpose of [excluding aliens from civil engineering] to assure responsibility for negligent workmanship sweeps

too broadly.  United States citizenship is not a guarantee that a civil engineer will continue to reside in Puerto Rico or even in the United States, and it bears no particular or rational relationship to skill, competence, or financial responsibility.  Puerto Rico has available to it other ample tools to achieve the goal of an engineer's financial responsibility without indiscriminately prohibiting the private practice of civil engineering by a class of otherwise qualified professionals.").

B.     *The LPR Distinction and the Federal Immigration Power*

"[States] can neither add to nor take from the conditions lawfully imposed by Congress upon admission, naturalization and residence of aliens within the United States or the several states.  State laws which impose discriminatory burdens upon the entrance or residence of aliens lawfully within the United States conflict with th[e] constitutionally derived federal power to regulate immigration, and have accordingly been held invalid."  *Toll*, 458 U.S. at 11 (quoting *Takahashi*, 334 U.S. at 419); *DeCanas v. Bica*, 424 U.S. 351, 358 n.6 (1976) (same).  This rule, established in *Takahashi* and relied upon in *Graham* and *Flores de Otero*, flows from two constitutional provisions: the Naturalization Clause, which gives Congress power to "establish an uniform Rule of Naturalization," Art. I, § 8, cl. 4; and the Supremacy Clause.  Art. VI, cl. 2.  *See Flores de Otero*, 426 U.S. at 602.

In *DeCanas*, the Court limited the *Takahashi* rule somewhat, but not in any way that affects its implications for § 6805(1)(6).  *DeCanas* held that a California law prohibiting employment of illegal aliens was a valid exercise of the state's police power and did not encroach on the federal immigration power.  424 U.S. at 352-53 ("[T]he Court has never held that every state enactment which in any way deals with aliens is a

regulation of immigration and thus per se pre-empted . . . . [S]tanding alone, the fact that aliens are the subject of a state statute does not render it a regulation of immigration . . . .").  But in carving out this exception for a state law that discriminated against only illegal aliens, the Court reinforced the *Takahashi* rule's applicability to state laws that discriminate against legal aliens: "State regulation not congressionally sanctioned that discriminates against aliens lawfully admitted to the country is impermissible if it imposes additional burdens not contemplated by Congress."  *Id*. at 358 n.6.  And in *Toll*, the Court applied the *Takahashi* rule to hold unconstitutional a non-LPR alienage classification quite similar to § 6805(1)(6): a University of Maryland policy that allowed only citizens and "aliens lawfully admitted for permanent residence" to qualify for preferential "in-state" tuition status.  458 U.S. at 3, 17 ("We cannot conclude that Congress ever contemplated that a State . . . might impose discriminatory tuition charges and fees solely on account of [a person's] federal immigration classification.").

Under these principles, Section 6805(1)(6) is even more clearly unconstitutional than under the Equal Protection Clause.  Indeed, in light of *Toll*, the LPR distinction is not a distinction at all.

The State makes two arguments.  First, it contends that the following provision of federal immigration law shows that § 6805(1)(6)'s discrimination is congressionally sanctioned: "If an occupation requires a state or local license for an individual to fully perform the duties of the occupation, an alien . . . seeking [a temporary visa to work] in that occupation must have that license prior to approval of the petition." 8 C.F.R. § 214.2(h)(4)(v)(A).  The State interprets this licensure requirement to mean that it may deny nonimmigrants the opportunity to practice pharmacy or other occupations based on

their immigration status, because the provision leaves professional licensing decisions to the states.  Under this reading, the federal laws creating H-1B and TN visa status are advisory: they indicate that nonimmigrants should be admitted to the country to practice specialty occupations, but they also allow the states to decide whether nonimmigrants (as a class, not as individuals) should be permitted to practice specialty occupations.  And if every state decided, like New York, that nonimmigrants should not enjoy this privilege, then they would write H-1B and TN status out of the United States Code.  A far more logical interpretation is that the licensure provision prescribes an old and familiar division of labor: the federal government decides which aliens may enter and with what restrictions, and the states decide which individuals have the professional competence and qualifications to obtain pharmacy and other licenses.  *See Watson v. Maryland*, 218 U.S. 173, 176 (1910) ("[T]he police power of the states extends to the regulation of certain trades and callings, particularly those which closely concern the public health . . . . [T]he power of the state may be exerted to see that only properly qualified persons shall undertake [the] responsible and difficult duties [of such professions].").

Second, the State relies on a passage of dicta from *Toll* to distinguish that case's holding:

> [W]hen Congress has done nothing more than permit a class of aliens to enter the country temporarily, the proper application of the principle [that states may not impose 'additional burdens not contemplated by Congress'] is likely to be a matter of dispute.  But the instant case does not present such a situation . . . .

458 U.S. at 12-13.  The plaintiffs in *Toll* had nonimmigrant G-4 visas, which cover the employees of certain international organizations (such as the World Bank) and their families.  *Id*. at 4; 8 U.S.C. § 1101(a)(15)(G)(iv).  The Court determined that G-4

nonimmigrants were not "temporary" aliens because federal immigration law did not require them to demonstrate "an intent not to abandon a foreign residence." *Toll*, 458 U.S. at 6 n.8.  The State argues that the above-quoted passage carves out a caveat to the *Takahashi* rule that governs this case.  *LeClerc* made the same argument.  419 F.3d at 424.

There are two problems with this argument.  First, most of the plaintiffs here are in all relevant respects similarly situated to the *Toll* plaintiffs.  H-1B aliens, like G-4 aliens, need not demonstrate an intent not to abandon a foreign residence.  *See LeClerc*, 419 F.3d at 411 n.4.  And G-4 visa holders, like H-1B visa holders, are admitted to the country for a finite period of time: G-4 holders for the duration of their employment at a qualifying international organization, *see* 8 C.F.R. § 214.2(g)(1), and H-1B holders for an initial term of three years.  8 C.F.R. §§ 214.2(h)(9)(iii)(A)(1).  Thus, *Toll*'s dicta does not apply to the twenty-two H-1B plaintiffs in this case.

More to the point, the passage of dicta from *Toll* is quite a small platform for the State's case.  The passage does not actually say that states may impose auxiliary burdens on nonimmigrant aliens as a class.  And here, the federal government has in fact done something "more than permit [plaintiffs] to enter the country temporarily"—it has permitted them to enter the country temporarily for the purpose of practicing specialty occupations like pharmacy.  By declaring that plaintiffs may not practice pharmacy, New York law unmistakably imposes "additional burdens not contemplated by Congress" and thus unconstitutionally encroaches upon the federal immigration power.  *DeCanas*, 424 U.S. at 358 n.6.

A final point.  The State argues that the four TN plaintiffs cannot argue preemption because the NAFTA Implementation Act provides that only the United States may bring actions attacking state laws that are inconsistent with NAFTA.  *See* 19 U.S.C. § 3312 (b)(2).  The Court finds it unnecessary to resolve this issue for two reasons.  First, 6805(1)(6) is unconstitutional as applied to the TN plaintiffs because it violates their Equal Protection rights, so it does not matter whether they may assert a preemption challenge.  Second, the argument that § 6805(1)(6) encroaches upon the federal immigration power does not actually depend on a conflict between state and federal law.  The doctrine is that "state laws which impose discriminatory burdens upon the entrance or residence of aliens lawfully within the United States conflict with th[e] *constitutionally derived federal power to regulate immigration . . . .*"  *Toll*, 458 U.S. at 11 (quoting *Takahashi*, 334 U.S. at 419) (emphasis supplied).  That §6805(1)(6) conflicts with or obstructs federal law is a separate argument that the Court does not address given its acceptance of plaintiffs' Equal Protection and *Takahashi* arguments.

## CONCLUSION

For the foregoing reasons, plaintiffs' motions for summary judgment [**37**, **41**] are granted in substantial part and defendants' motion [**33**] is denied in substantial part.  The individual defendants are permanently enjoined from applying or enforcing § 6805(1)(6) against plaintiffs.  Plaintiffs' claims against the agencies are dismissed, as are their claims for monetary damages.

SO ORDERED.

Dated: New York, New York
       September 29, 2010

Richard J. Holwell
United States District Judge