# MANDATE

**UNITED STATES COURT OF APPEALS
FOR THE
SECOND CIRCUIT**

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, in the City of New York, on the 10th day of July, two thousand twelve.

Before: RICHARD C. WESLEY,
 PETER W. HALL,
  *Circuit Judges*,
 STEFAN R. UNDERHILL,
  *District Judge.* *

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _July 31, 2012_

---

VENKAT RAO DANDAMUDI, NAVEEN PARUPALLI,
SUNITHA TALLURI, NAREEN ADUSUMELLI, JITENDRA
KUMAR PATEL, LAVANYA AKULA, HAREEN KARRA,
HOLLY ELIZABETH BENOIT, YECHAM KUMARASWAMY,
GRACE CHAN, HERNG YIH LAI, JITENDRA KESHAVLAL
PATEL, SUMIRKUMAR S. TALATI, SIREESH K.
THUMMALAPALLY, KAICHUAN YEH,

 *Plaintiffs - Appellees,*

VISHNU AKULA, BALAJI DUDDUKURU, MURALI
KOTHURI, ALANNA FARRELL,

 *Consolidated Plaintiffs - Appellees,*

LAKSHMAN RAO PAIDI, NITASHA KHURANA, YOUNG
MEE LEE, XUAN UYEN NGHIEM, SIRISHA PARUPALLI,
YVONNE MAY PERRY, HARINATH TALAMPALLY,
RAVI KUMAR CHENNA, GETU NAGASA, PHUONG GIANG,
NGOC BUI, SEONG MI SEO KIM, KRISHNA
KISHORE INAPURI,

 *Plaintiffs,*

 v.

MERRYL H. TISCH, Chancellor of the New York State Board
of Regents, DAVID STEINER, Commissioner of Education,

 *Defendants - Appellants.*

JUDGMENT

Docket No.: 10-4397

---

# MANDATE ISSUED ON 07/31/2012

The appeal in the above captioned case from an order of the United States District Court for the Southern District of New York was argued on the district court's record and the parties' briefs.  Upon consideration thereof,

IT IS HEREBY ORDERED, ADJUDGED and DECREED that the order of the district court granting summary judgment to plaintiffs is AFFIRMED in accordance with the opinion of this court.

For The Court:

Catherine O'Hagan Wolfe,
Clerk of Court

_____
*       The Honorable Stefan R. Underhill, of the United States District Court for the District of Connecticut, sitting by designation.

A True Copy

Catherine O'Hagan Wolfe, Clerk

United States Court of Appeals, Second Circuit

**10-4397-cv**
**PAIDI v. MILLS**

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

_____

August Term, 2011

(Argued: January 9, 2012          Decided: July 10, 2012)

Docket No. 10-4397-cv

_____

VENKAT RAO DANDAMUDI, NAVEEN PARUPALLI, SUNITHA TALLURI,
NAREEN ADUSUMELLI, JITENDRA KUMAR PATEL, LAVANYA AKULA,
HAREEN KARRA, HOLLY ELIZABETH BENOIT, YECHAM KUMARASWAMY,
GRACE CHAN, HERNG YIH LAI, JITENDRA KESHAVLAL PATEL,
SUMIRKUMAR S. TALATI, SIREESH K. THUMMALAPALLY, KAICHUAN
YEH,

*Plaintiffs-Appellees*,

VISHNU AKULA, BALAJI DUDDUKURU, MURALI KOTHURI,
ALANNA FARRELL,

*Consolidated Plaintiffs-Appellees*,

LAKSHMAN RAO PAIDI, NITASHA KHURANA, YOUNG MEE LEE, XUAN
UYEN NGHIEM, SIRISHA PARUPALLI, YVONNE MAY PERRY, HARINATH
TALAMPALLY, RAVI KUMAR CHENNA, GETU NAGASA, PHUONG GIANG,
NGOC BUI, SEONG MI SEO KIM, KRISHNA KISHORE INAPURI,

*Plaintiffs*,

—v.—

MERRYL H. TISCH, Chancellor of the New York State Board of
Regents, DAVID STEINER, Commissioner of Education,

*Defendants-Appellants*,

RICHARD P. MILLS, Commissioner of Education, NEW YORK STATE
DEPARTMENT OF EDUCATION, ROBERT M. BENNETT, Chancellor of
the New York State Board of Regents, NEW YORK STATE BOARD OF
REGENTS,

*Defendants.*

_____

Before:
    WESLEY, HALL, *Circuit Judges*, UNDERHILL, *District Judge.*[*]

    Appeal from an order of the United States District
Court for the Southern District of New York (Holwell, *J.*),
entered on September 30, 2010, granting plaintiffs' motions
for summary judgment and enjoining defendants from applying
or enforcing New York Education Law § 6805(1)(6) against
plaintiffs.

    AFFIRMED.

_____

        ANDREW B. AYERS, Assistant Solicitor General
            (Barbara D. Underwood, Solicitor General,
            Denise A. Hartman, Assistant Solicitor
            General, *on the brief*), *for* Eric T.
            Schneiderman, Attorney General of the State of
            New York, Albany, NY, *for Defendants-
            Appellants.*

        MARGARET A. CATILLAZ (Jeffrey A. Wadsworth, *on the
            brief*), Harter Secrest & Emery LLP, Rochester,
            NY, *for Plaintiff-Appellee Alanna Farrell.*

        KRISHNAN CHITTUR, Chittur & Associates, P.C., New
            York, NY, *for remaining Plaintiffs-Appellees.*

_____

    [*]Judge Stefan R. Underhill, of the United States
District Court for the District of Connecticut, sitting by
designation.

2

1    WESLEY, *Circuit Judge*:

2          This case involves a state regulatory scheme that seeks

3    to prohibit some legally admitted aliens from doing the very

4    thing the federal government indicated they could do when

5    they came to the United States—work.  Plaintiffs-Appellees

6    are a group of nonimmigrant aliens who have been authorized

7    by the federal government to reside and work as pharmacists

8    in the United States.  All currently reside in New York and

9    are licensed pharmacists there.  Plaintiffs obtained

10   pharmacist's licenses from New York pursuant to a statutory

11   waiver to New York Education Law § 6805(1)(6)'s requirement

12   that only U.S. Citizens or Legal Permanent Residents

13   ("LPRs") are eligible to obtain a pharmacist's license in

14   New York.  The waiver provision was set to expire in 2009.

15   In response, plaintiffs sued various state officials[1]

16   responsible for enforcing the law in the United States

17   District Court for the Southern District of New York.

18

---

[1] Although we recognize that the State of New York is not
explicitly named as a party to this case, the arguments made by
appellants here are clearly made on behalf of the state and the
statute at issue was defended on appeal by the Solicitor
General's Office of the State of New York.  We think it
appropriate, therefore, to refer to the parties bringing the
appeal collectively as "the state" or "New York."

3

1    Plaintiffs allege that § 6805(1)(6) is unconstitutional

2    because it violates the Equal Protection and Supremacy

3    Clauses of the United States Constitution.  In a thorough

4    and well-reasoned opinion, the district court granted

5    plaintiffs' motion for summary judgment and permanently

6    enjoined defendants from enforcing the law.  *See Adusumelli*

7    *v. Steiner*, 740 F. Supp. 2d 582 (S.D.N.Y. 2010).

8    On appeal, New York asks us to abrogate the Supreme

9    Court's general rule that state statutes that discriminate

10   based on alienage are subject to strict scrutiny review.

11   The state argues that the statute at issue here, which

12   discriminates against nonimmigrant aliens should be reviewed

13   only to determine if there is a rational basis that supports

14   it.  In our view, however, a state statute that

15   discriminates against aliens who have been lawfully admitted

16   to reside and work in the United States should be viewed in

17   the same light under the Equal Protection Clause as one

18   which discriminates against aliens who enjoy the right to

19   reside here permanently.  Applying strict scrutiny,

20   therefore, and finding, as the state concedes, that there

21   are no compelling reasons for the statute's discrimination

22   based on alienage, we hold the New York statute to be

4

1    unconstitutional.  We affirm the district court's grant of

2    summary judgment for plaintiffs.

3                             **I. BACKGROUND**

4       Most of the plaintiffs have H-1B temporary worker

5    visas.  Under the Immigration and Nationality Act ("INA"),

6    H-1B visas may be given to aliens who come "temporarily to

7    the United States to perform services . . . in a specialty

8    occupation."  8 U.S.C. § 1101(a)(15)(H)(i)(b).  The

9    remaining plaintiffs have what is known as "TN" status.

10    "TN" status is a temporary worker status created by federal

11    law pursuant to the North American Free Trade Agreement

12    ("NAFTA").  NAFTA permits "a citizen of Canada or Mexico who

13    seeks temporary entry as a business person to engage in

14    business activities at a professional level" to enter the

15    United States and work here pursuant to the requirements of

16    the TN status.  8 C.F.R. § 214.6(a).

17       These provisions technically grant plaintiffs admission

18    to the United States for a finite period.  Because

19    plaintiffs' status grants them the right to reside and work

20    in the United States only temporarily, plaintiffs are part

21    of the group of aliens the immigration law refers to as

22    nonimmigrants.  8 U.S.C. § 1101(a)(15).  And, although

1  plaintiffs had to indicate that they did not intend to stay

2  here permanently to obtain their visas, the truth is that

3  many (if not all) actually harbor a hope (a dual intention)

4  that some day they will acquire the right to stay here

5  permanently.  The BIA and the State Department both

6  recognize this doctrine of dual intent, which allows aliens

7  to express an intention to remain in the United States

8  temporarily (to satisfy the requirements of their temporary

9  visas) while also intending to remain permanently, which

10  allows them to apply for an adjustment of status.  *Matter of*

11  *Hosseinpour*, 15 I. & N. Dec. 191 (BIA 1975); 70 No. 42

12  Interpreter Releases 1444, 1456-58 (Nov. 1, 1993).

13      For purposes of both the H1-B and TN visas, the initial

14  period during which the visa-holder can legally remain and

15  work in the United States is three-years.  8 C.F.R.

16  §§ 214.2(h)(9)(iii)(A)(1) (H1-B visa), 214.6(e) (TN status).

17  Each visa status also permits a three-year extension of the

18  initial period.  *Id.* at §§ 214.2(h)(15)(ii)(B), 214.6(h).

19  But an alien with an H1-B visa is limited to one such

20  extension, essentially restricting H1-B status to a six-year

21  period.[2]  *Id.* at § 214.2(h)(15)(ii)(B)(1).  In practice,

---

[2] Although not applicable in the instant case, an H-1B visa
holder who is involved in a "DOD research and development or co-

6

1    however, federal law permits many aliens with TN or H1-B

2    status to maintain their temporary worker authorization for

3    a period greater than six years.  All plaintiffs in this

4    case, for example, have been *legally authorized* to reside

5    and work in the United States for more than six years.  And,

6    six plaintiffs have been authorized to reside and work in

7    the United States for more than ten years.

8        Several factors contribute to the difference between

9    the technical limitations on H1-B and TN status and the

10   length of time these aliens remain authorized to reside and

11   work in the United States.   Many aliens who receive

12   temporary worker authorization are former students who

13   entered the United States with a student visa and who have

14   made their home in the United States for many years before

15   entering the professional world.[3]  Many nonimmigrant aliens

16   are also often eligible to apply for LPR status.  This

17   process is typically quite slow, and the federal government

18   therefore regularly issues Employment Authorization

---

production project" may maintain his H-1B visa status for a total
of 10 years.  8 C.F.R. § 214.2(h)(15)(ii)(B)(2).

    [3] Initially entering the United States on a student visa
extends the amount of time a nonimmigrant alien can remain in the
United States because the time limitations for H1-B status and TN
status are not impacted by time previously spent residing in the
United States pursuant to a student visa.

7

1    Documents ("EADs"), which extend the time period during

2    which these aliens are eligible to work in the United States

3    while they await their green cards.   8 C.F.R.

4    § 274a.12(c)(9).

5         Twenty-two plaintiffs have applied for Permanent

6    Resident status.[4]  Sixteen have received EADs because they

7    have exhausted the six-year maximum authorization provided

8    by H1-B status.

9         Based on their visa status, all plaintiffs currently

10   reside in the United States legally and have permission to

11   work here.   All are pharmacists who were granted a

12   pharmacist's license (albeit a "limited" one) pursuant to a

13   previous version of the New York statute at issue here.[5]

14   Section 6805(1)(6), in its current incarnation, provides

---

[4] During the pendency of this appeal, plaintiff-appellee Gutu
Nagasa was granted a green card, making the appeal moot as to
him.  And, in a previous case, we dismissed an appeal raising
identical issues with regard to New York's analogous law
restricting professional veterinarian licenses to citizens and
LPRs because the plaintiff-appellee was granted permanent
resident status while the appeal was pending.  *See Kirk v. N.Y.
State Dep't of Educ.*, 644 F.3d 134, 136 (2d Cir. 2011).

[5] A previous version of the statute included a three-year
waiver of the citizenship/LPR requirement for otherwise qualified
pharmacists.  It also permitted a one-year extension of that
waiver.  The waiver provision expired in October 2006.  Pursuant
to the expiration requirement, plaintiffs' pharmacist's licenses
were set to expire in 2009 and were not eligible for renewal.
Plaintiffs' licenses were renewed pending the outcome of this
litigation.

1    that to be eligible for a pharmacist's license in New York,

2    an applicant must be either a U.S. Citizen or a LPR.[6]  The

3    statute bars all other aliens, including those with work-

4    authorization who legally reside in the United States, from

5    becoming licensed pharmacists.

6                          **II. DISCUSSION**

7        New York argues that neither the Equal Protection

8    Clause nor the Supremacy Clause prevents a state from

9    prohibiting a group of aliens who are legally authorized to

10   reside and work in the United States from working in certain

11   professions.  The state relies principally on two decisions

12   from our sister circuits.  *See League of United Latin Am.*

13   *Citizens (LULAC) v. Bredesen*, 500 F.3d 523, 531-34, 536-37

14   (6th Cir. 2007); *LeClerc v. Webb*, 419 F.3d 405, 415 (5th

15   Cir. 2005), *reh'g en banc denied*, 444 F.3d 428 (2006).[7]  The

16   Fifth and Sixth Circuits viewed nonimmigrant aliens as

---

[6] Similar provisions of the New York Education Law preclude
non-LPR aliens from other professions.  See N.Y. Educ. Law
§§ 6524(6) (physicians), 6554(6) (chiropractors), 6604(6)
(dentists), 6609(6) (dental hygienists), 6704(6) (veterinarians),
6711(6) (veterinary technicians), 6955(1)(6) (midwives),
7206(1)(6) (engineers), 7206-a(1)(6) (land surveyors), 7324(1)(6)
(landscape architects), 7504(1)(6) (certified shorthand
reporters), 7804(5) (massage therapists).

[7] The plaintiffs in *LeClerc* were aliens with J-1 student
visas and H1-B worker visas. 419 F.3d at 410-12.

9

1   distinct from aliens with LPR status and applied a rational

2   scrutiny test to determine if the state statutes in question

3   ran afoul of the Equal Protection Clause.  In both cases,

4   the courts "decline[d] to extend" the protections of LPRs to

5   certain nonimmigrants.  *LULAC*, 500 F.3d at 533; *LeClerc*, 419

6   F.3d at 419.  We disagree; the Supreme Court has repeatedly

7   affirmed the general principle that alienage is a suspect

8   classification and has only ever created two exceptions to

9   that view.  We decline to create a third in a case where the

10  statute discriminates against aliens who have been granted

11  the legal right to reside and work in the United States.

12  Under a strict scrutiny analysis, § 6805(1)(6) of the New

13  York Education Law violates the Equal Protection Clause.

14              *The Equal Protection Clause*

15       The Fourteenth Amendment provides that states may not

16  "deny to any person within its jurisdiction the equal

17  protection of the laws."  U.S. Const. amend. XIV, § 1.

18  Under the Fourteenth Amendment, a law that "impermissibly

19  interferes with the exercise of a fundamental right or

20  *operates to the peculiar disadvantage of a suspect class*" is

21  reviewed under the strict scrutiny standard.  *Mass. Bd. of*

22  *Ret. v. Murgia*, 427 U.S. 307, 312 (1976) (emphasis added)

10

1    (footnote omitted); *see Weinstein v. Albright*, 261 F.3d 127,
2    140 (2d Cir. 2001).

3         There is no question that the Fourteenth Amendment
4    applies to *all* aliens.  *See, e.g.*, *Plyler v. Doe*, 457 U.S.
5    202, 215 (1982).  Indeed, the Supreme Court has long held
6    that states cannot discriminate on the basis of alienage.
7    "Aliens as a class are a prime example of a discrete and
8    insular minority," the Court reasoned in *Graham v.*
9    *Richardson*, "[and] the power of a state to apply its laws
10   exclusively to its alien inhabitants as a class is confined
11   within narrow limits."  403 U.S. 365, 372 (1971) (internal
12   quotation marks omitted).

13        In *Graham*, the Court struck down two state statutes
14   that prevented immigrants from receiving public assistance.
15   *Id.* at 376.  The statutes erected different barriers—a
16   Pennsylvania law barred non-citizens from a welfare program,
17   while an Arizona law required that aliens reside in the
18   state for fifteen years before they could collect money from
19   the state—both achieved the same result.  *Id.* at 367-68.
20   Thus, aliens were denied access to a benefit available to
21   citizens.  *Graham* held this "two class" system
22   unconstitutional.  *Id.* at 371.

11

1    *Graham* is considered the lodestar of the Court's

2    alienage discrimination doctrine, but the opinion invokes a

3    case decided decades before.  In *Takahashi v. Fish and Game*

4    *Commission*, the Supreme Court struck down a California

5    statute that denied fishing licenses to any "person

6    ineligible [for] citizenship."  334 U.S. 410, 413 (1948).

7    The law originally targeted Japanese fishermen, but the

8    state legislature feared that such a clearly discriminatory

9    classification might run afoul of the Equal Protection

10   Clause and amended the statute to prohibit immigrants

11   "ineligible [for] citizenship" from obtaining fishing

12   licenses.  *Id.; see also id.* at 422-27 (Murphy, *J.*,

13   concurring).  The provision drew a distinction between

14   groups based solely on the members' immigration status

15   without any mention of race or nationality.  The Court held

16   that treating groups differently based on the members'

17   alienage was akin to discriminating against a group because

18   of their race or color.  "The protection of [the Fourteenth

19   Amendment] has been held to extend to aliens as well as to

20   citizens," the Court reasoned, "[and] *all persons lawfully*

21   *in this country* shall abide . . . on an equality of legal

22   privileges with all citizens."  *Id.* at 419-20 (emphasis

23   added).

12

1        The *Graham* Court saw Pennsylvania and Arizona's

2    restrictions on welfare as exacting the same toll as

3    California's unconstitutional fishing-license regime; the

4    Court thus followed *Takahashi* to hold that the welfare

5    statutes were subject to strict scrutiny.  *Graham*, 403 U.S.

6    at 372.

7        In the years after *Graham*, the Court continued to apply

8    strict scrutiny to statutes discriminating on the basis of

9    alienage.  It invalidated a New York statute that prohibited

10   immigrants from working in the civil service, *Sugarman v.*

11   *Dougall*, 413 U.S. 634, 642-43 (1973), a Connecticut statute

12   that barred immigrants from sitting for the bar, *In re*

13   *Griffiths*, 413 U.S. 717, 721-22, 729 (1973), a Puerto Rico

14   law that denied licenses to immigrant engineers, *Examining*

15   *Board of Engineers, Architects and Surveyors v. Flores de*

16   *Otero*, 426 U.S. 572, 601-06 (1976), and a New York law that

17   required immigrants to pledge to become citizens before they

18   could receive financial aid, *Nyquist v. Mauclet*, 432 U.S. 1,

19   7, 12 (1977).  In each case, the Court began its discussion

20   by reasserting its commitment to the holding in *Graham*: laws

21   that single out aliens for disparate treatment are

22   presumptively unconstitutional absent a showing that the

13

1  classification was "necessary" to fulfill a constitutionally

2  "permissible" and "substantial" purpose.  *In re Griffiths*,

3  413 U.S. at 721-22.[8]

4       The Court has recognized only two exceptions to

5  *Graham*'s rule.  The first exception allows states to exclude

6  aliens from political and governmental functions as long as

7  the exclusion satisfies a rational basis review.  In *Foley*

8  *v. Connelie*, the Court upheld a statute that prohibited

9  aliens from working as police officers.  435 U.S. 291, 295-

10  96.  For a democracy to function, the Court reasoned, a

11  state must have the power to "preserve the basic conception

12  of a political community," and states can limit certain

13  "important nonelective executive, legislative, and judicial

14  positions [to] officers who participate directly in the

15  formulation, execution, or review of broad public policy."

16  *Id.* at 296 (internal quotation marks omitted).

17       The second exception crafted by the Court allows states

18  broader latitude to deny opportunities and benefits to

19  undocumented aliens.  *See, e.g.*, *Plyler*, 457 U.S. at 219;

_____

[8] Each of these cases was a facial challenge: Plaintiffs
argued that the statutes were unconstitutional on their face
because they drew explicit distinctions between citizens and
non-citizens, not just because a state had interpreted a statute
to deny benefits to a group of aliens.

14

1   *see also DeCanas v. Bica*, 424 U.S. 351 (1976), *superseded by*
2   *statute on other grounds as stated in Chamber of Comm. v.*
3   *Whiting*, 131 S. Ct. 1968 (2011).  In *Plyler*, the Court
4   declined to apply strict scrutiny to a statute that
5   prohibited undocumented alien children from attending public
6   school.  457 U.S. at 223.  The Court acknowledged that
7   *Graham* placed a heavy burden on state statutes targeting
8   lawful aliens, but reasoned that undocumented aliens fell
9   outside of *Graham*'s reach because "their presence in this
10  country in violation of federal law is not a 'constitutional
11  irrelevancy.'"  *Id.* (citations omitted).  The Court held
12  that the plaintiffs' unlawful status eliminated them from
13  the suspect class of aliens generally; nevertheless, the
14  Court applied a *heightened* rational basis standard to the
15  Texas law denying free public education to undocumented
16  alien children and found the law unconstitutional.[9]  *Plyler*,
17  457 U.S. at 230 (holding that the state had to show that the
18  statute furthered "some substantial goal of the state").
19      Thus, statutes that deny opportunities or benefits to
20  aliens are subject to strict scrutiny unless they fall

---

[9] In *Plyler*, the Court explained that undocumented aliens
are not a suspect class, but noted that it was reluctant to
punish undocumented alien children for their parents' decision to
break the law.  *Id.* at 219-20.

15

1    within two narrow exceptions.  The first allows states to

2    exclude aliens from certain civic roles that directly affect

3    the political process.  The second acknowledges that people

4    who reside in the United States without authorization may be

5    treated differently than those who are here legally.

6         The state acknowledges that neither exception applies

7    here.  Without an existing basis for distinguishing *Graham*'s

8    requirement that such statutes are strictly scrutinized, New

9    York proposes a third exception—the Fourteenth Amendment's

10   strongest protections should apply only to virtual citizens,

11   like LPRs, and not to other lawfully admitted aliens who

12   require a visa to remain in this country.  Defendants argue

13   that the Supreme Court's strict scrutiny analysis of

14   classifications based on "alienage" is inapplicable to

15   classifications of nonimmigrant aliens and that only

16   rational basis review of the statute is required.

17        The state reasons that the Supreme Court has never

18   explicitly applied strict scrutiny review to a statute

19   discriminating against nonimmigrant aliens.  That is true,

20   but that argument ignores the underlying reasoning of the

21   Court in its prior decisions as well as the fact that the

22   Court has never held that lawfully admitted aliens are

16

1    outside of *Graham*'s protection.  Indeed, the Court has never

2    distinguished between classes of *legal* resident aliens.[10]

3    The state's argument that suspect class protection extends

4    no further than to LPRs simply has no mooring in the High

5    Court's prior ventures into this area.

6         New York disagrees and urges us to follow the lead of

7    the Fifth and Sixth Circuits, both of which drew a

8    distinction between LPRs and citizens, on the one hand, and

9    other lawfully admitted aliens, on the other.  In *LeClerc*,

10   the Fifth Circuit upheld a Louisiana Supreme Court rule that

11   required applicants for admission to the Louisiana State Bar

12   to be citizens or LPRs.  419 F.3d at 422.  The majority

13   noted that "[l]ike citizens, [permanent] resident aliens may

14   not be deported, are entitled to reside permanently in the

15   United States, may serve . . . in the military, . . . and

16   pay taxes on the same bases as citizens."  *Id.* at 418.

---

[10] Notably, it was in his dissent in *Toll v. Moreno*, 458 U.S.
1, 44-45 (1982) (Rehnquist, *J.*, dissenting), that Justice
Rehnquist pointed out such a distinction.  There he wrote:

> In each case in which the Court has tested state
> alienage classifications . . . the question has
> been the extent to which the States could
> permissibly distinguish between citizens and
> permanent resident aliens. . . .  [T]he need for
> strict scrutiny simply does not apply to state
> policies that distinguish between permanent
> resident aliens and nonimmigrants.

17

1     In *LULAC*, the Sixth Circuit upheld a Tennessee law that

2     conditioned issuance of a driver's license on proof of

3     United States citizenship or LPR status.  500 F.3d at 533.

4     The Sixth Circuit, like the Fifth, held that nonimmigrant

5     aliens are not a suspect class because, unlike citizens and

6     LPRs, they "are admitted to the United States only for the

7     duration of their authorized status, are not permitted to

8     serve in the U.S. military, are subject to strict employment

9     restrictions, incur differential tax treatment, and may be

10    denied federal welfare benefits."  *Id.; see also LeClerc*,

11    419 F.3d at 418-19.  The state would have us join these

12    courts and narrow *Graham*'s holding to reach only those

13    aliens who are indistinguishable from citizens.  This

14    argument, however, misconstrues both law and fact.

15    Ultimately, for three reasons, we reject the state's

16    argument that this Court should follow the rationale of the

17    Fifth and Sixth Circuits.  First, the Supreme Court's

18    listing in *Graham* of the similarities between citizens and

19    aliens refuted the state's argument that it did have a

20    compelling reason for its law, but this language does not

21    articulate a test for determining when state discrimination

22    against any one subclass of lawful immigrants is subject to

18

1    strict scrutiny.  Second, nonimmigrant aliens are but one

2    subclass of aliens, and the Supreme Court recognizes aliens

3    generally as a discrete and insular minority without

4    significant political clout.  Third, even if this Court were

5    to determine that the appropriate level of scrutiny by which

6    to analyze the discrimination should be based on the

7    nonimmigrant aliens' similarity (or proximity) to citizens,

8    we would still apply strict scrutiny in this case because

9    nonimmigrant aliens are sufficiently similar to citizens

10   that discrimination against them in the context presented

11   here must be strictly scrutinized.

12       Despite the fact that the Supreme Court has never

13   cabined its precedent in this area to distinguish between

14   discrimination against LPRs and discrimination against other

15   lawfully present aliens and has never distinguished

16   *Takahashi*, the Fifth and Sixth Circuits justified narrowing

17   *Graham* by resting their analysis on the closing words of

18   *Graham*'s discussion of the Equal Protection Clause.  In that

19   passage, the Court noted: "Aliens like citizens pay taxes

20   and may be called into the armed forces.  Unlike the

21   short-term residents in *Shapiro*, aliens may live within a

22   state for many years, work in the state and contribute to

                                    19

1  the economic growth of the state."  *Graham*, 403 U.S. at 376

2  (internal quotation marks omitted).[11]

3       Viewing that language from *Graham* as an analytical

4  tool, however, reveals the danger of separating the words of

5  an opinion from the context in which they were employed.

6  *Graham* drew a comparison between LPRs and citizens to refute

7  the states' arguments that there was a compelling interest

8  in the restrictive legislation—the states had limited funds

9  and the benefits in question should go to citizens to the

10 exclusion of LPRs.  *Id.*  The states contended that they had

11 a legitimate interest in preserving welfare funds for their

12 citizens-individuals who participated in economic activity

13 within the state and thereby generated tax revenue that

14 supported the benefits.  The Court was quick to reply that

15 "a State's desire to preserve limited welfare benefits for

16 its own citizens is inadequate to justify [the state's

17 discriminatory laws]."  *Id.* at 374.  It noted that legal

18 aliens are in many ways indistinguishable from citizens and

---

[11] We see no connection between practicing law in Louisiana or driving a car in Tennessee and military service, restricted job opportunities, or differences in taxation.  Neither did Louisiana or Tennessee as neither state statute restricted the privileges in question to those citizens who had served in the military, worked, or paid taxes.  The classifications in question focused on a distinct and identifiable minority even though there was no constitutionally relevant reason for the distinction.

1    then provided a few examples of that fact:

2        [T]he justification of limiting expenses is particularly
3        inappropriate and unreasonable when the discriminated
4        class consists of aliens. Aliens like citizens pay taxes
5        and may be called into the armed forces. Unlike the
6        short-term residents in *Shapiro*, aliens may live within
7        a state for many years, work in the state and contribute
8        to the economic growth of the state.
9
10   *Id.* (internal quotation marks omitted).

11       The Court in essence pointed out that, because LPRs

12   and citizens have much in common, treating them differently

13   does not pass muster under the Fourteenth Amendment.  The

14   converse of this rationale, however, does not become a

15   litmus test for determining whether a particular group of

16   aliens is a suspect class.  A group of aliens need not be

17   identical or even virtually identical to citizens to be

18   fully protected by the Fourteenth Amendment.  Indeed,

19   citizens and aliens may be sufficiently similar merely

20   because they are both lawful residents.  Nor do we think

21   that the list of similarities is meant as a litmus test for

22   lower courts to apply to a subclass of lawfully admitted

23   aliens for purposes of determining how similar they are to

24   citizens before applying strict scrutiny—the greatest level

25   of Fourteenth Amendment protection—to analyze discrimination

26   against that subclass.

21

1    Nothing in the Supreme Court's precedent counsels us to
2    "judicially craft[] a subset of aliens, scaled by how [we]
3    perceive the aliens' proximity to citizenship." *LeClerc v.*
4    *Webb*, 444 F.3d 428, 429 (5th Cir. 2006) (Higginbotham, *J.*,
5    dissenting from the denial of reh'g en banc).[12]  Rather, the
6    Court's precedent supports drawing a distinction among
7    aliens only as between lawfully admitted aliens and those
8    who are in the United States illegally.[13]  *See Plyler*, 457

---

[12] Neither are we persuaded by the state's claim that the
statute must be reviewed under a rational basis framework because
it only discriminates against a subset of aliens.  The Court
roundly rejected such an argument in *Nyquist*, 432 U.S. at 7-9.
There, the Court explained that the mere fact that the
legislature distinguished "only within the heterogenous class of
aliens and . . . not . . . between citizens and aliens vel non"
did not remove the statute from strict scrutiny review because
the important consideration was that the statute was "directed at
aliens and that only aliens are harmed by it.  The fact that the
statute is not an absolute bar does not mean that it does not
discriminate against the class." *Id.* at 8-9 (internal quotation
marks omitted).

[13] That aliens are a suspect class not merely because they
bear all, or most, of the responsibilities of citizenship is
evident from the Court's other pronouncements regarding why
aliens are a suspect class.  The Supreme Court noted in *Flores de
Otero*, for example, that
    The underpinnings of the Court's constitutional decisions
    defining the circumstances under which state and local
    governments may favor citizens of this country by denying
    lawfully admitted aliens equal rights and opportunities have
    been two. The first, based squarely on the concepts embodied
    in the Equal Protection Clause of the Fourteenth Amendment and
    in the Due Process Clause of the Fifth Amendment, recognizes
    that "(a)liens as a class are a prime example of a 'discrete
    and insular' minority . . . for whom . . . heightened judicial
    solicitude is appropriate.  The second, grounded in the

22

1   U.S. at 223 (utilizing a heightened rational basis review

2   for a state law discriminating against *undocumented* alien

3   children).

4       Any other distinction ignores that the Fourteenth

5   Amendment is written broadly as protecting *all persons* and

6   that aliens necessarily constitute a "discrete and insular"

7   minority because of their "impotence in the political

8   process, and the long history of invidious discrimination

9   against them."  *LeClerc*, 419 F.3d at 428-29 (Stewart, *J.*,

10  dissenting) (citing *Plyler*, 457 U.S. at 218 n.14).  Notably,

11  the bedrock of the Supreme Court's decisions in this area is

12  the fact that although lawfully admitted aliens and citizens

13  are not constitutionally distinguishable, aliens constitute

14  a discrete and insular minority because of their limited

15  role in the political process.  *LeClerc*, 419 F.3d at 428-29

16  (Stewart, *J.* dissenting) (citing *Plyler*, 457 U.S. at 218

17  n.14; Erwin Chemerinsky, Constitutional Law 618-19 (1997));

18  *see also Foley*, 435 U.S. at 294.  Certainly, nonimmigrant

19  aliens cannot be said to suffer less from these limitations

---

Supremacy Clause, Const., Art. VI, cl. 2, and in the
naturalization power, Art. I, § 8, cl. 4, recognizes the
Federal Government's primary responsibility in the field of
immigration and naturalization.
426 U.S. at 602 (quoting *Graham*, 403 U.S. at 372).

23

1    than LPRs and indeed, likely are "more powerless and

2    vulnerable to state predations—more discrete and insular."

3    *See Constitutional Law - Equal Protection - Fifth Circuit*

4    *Holds that Louisiana Can Prevent Nonimmigrant Aliens from*

5    *Sitting for the Bar*, 119 Harv. L. Rev. 669, 674 (2005)

6    (internal quotation marks omitted).

7        But even if the state's argument—that Supreme Court

8    precedent allows for a distinction based on a subclass's

9    similarity to citizens—had some traction, we conclude strict

10    scrutiny still applies. Nonimmigrants do pay taxes, often

11    on the same terms as citizens and LPRs, and certainly on

12    income earned in the United States. *See* 26 U.S.C.

13    § 7701(b); *see also LeClerc*, 419 F.3d at 427 n.1 (Stewart,

14    *J.*, dissenting). Further, any claimed distinction based on

15    permanency of residence is equally disingenuous. Although

16    it is certainly true that nonimmigrants must indicate an

17    intent not to remain permanently in the United States, this

18    ignores the dual intent doctrine—nonimmigrant aliens are

19    lawfully permitted to express an intent to remain

20    temporarily (to obtain and maintain their work visas) as

21    well as an intent to remain permanently (when they apply for

22    LPR status). *LeClerc*, 419 F.3d at 429 (Stewart, *J.*,

24

1   dissenting).  And the final distinction—limited work

2   permission—is wholly irrelevant where, as here, the state

3   seeks to prohibit aliens from engaging in the very

4   occupation for which the federal government granted the

5   alien permission to enter the United States.[14]

6       Because most of the distinctions the state would have

7   us make between LPRs and nonimmigrants are either

8   inapplicable or without constitutional relevance, we agree

9   with the district court that the state's argument "boil[s]

10  down to one potentially important difference—nonimmigrants

11  have not yet obtained permission to reside in the United

12  States permanently—and a slew of other differences of

13  uncertain relevance."  *Adusumelli*, 740 F. Supp. 2d at 592.

14      The core of the state's argument (and the analytical

15  pivot of *LeClerc* and *LULAC*) is "transience."  The state

16  argues that the nonimmigrant's transient immigration status

17  distinguishes nonimmigrant aliens from LPRs and introduces

18  legitimate state concerns that would allow for rational

---

[14] Some of the other distinctions relied on by the Fifth and
Sixth Circuits (military service and ineligibility for federal
benefits) simply lack legislative relevance.  Certainly the
federal government, which bears the constitutional responsibility
of regulating immigration, has much broader latitude to
distinguish among subclasses of aliens.  But this latitude does
not give states carte blanche to do the same.  *See Takahashi*, 334
U.S. at 420.

1    basis review of the statute.  This focus on transience is

2    overly formalistic and wholly unpersuasive.  The aliens at

3    issue here are "transient" in name only.  Certainly the

4    status under which they were admitted to the United States

5    was of limited duration.  But the reality is quite

6    different.  A great number of these professionals remain in

7    the United States for much longer than six years and many

8    ultimately apply for, and obtain, permanent residence.[15]

9    These practicalities are not irrelevant.  They demonstrate

10   that there is little or no distinction between LPRs and the

11   lawfully admitted nonimmigrant plaintiffs here.  Therefore,

12   even if the Supreme Court's precedent were read to require a

13   determination that the subclass of aliens at issue is

14   similar to LPRs or citizens, strict scrutiny would apply.

15        Finally, creating a third exception to strict scrutiny

16   analysis for statutes discriminating against lawfully

17   admitted aliens would create odd, some might say absurd,

18   results.  If statutes discriminating against *lawfully*

---

[15] This fact is borne out by the realities of the case before
us as well as the previous appeal in *Kirk*.  Here, one of the
plaintiffs was granted permanent resident status during the
pendency of this appeal.  And, in *Kirk*, we held the appeal moot
because the plaintiff was granted permanent resident status
during the pendency of the appeal.  *Kirk*, 644 F.3d at 136.  As
much as the state wants to lump nonimmigrants in the same
category as tourists such a classification makes no sense.

1    admitted nonimmigrant aliens were reviewed under a rational

2    basis framework that would mean that a class of *unlawful*

3    aliens would receive greater protection against state

4    discriminatory statutes than those *lawfully* present.  *See*

5    *Plyler*, 457 U.S. at 202.  In *Plyler* the Court applied a

6    *heightened* rational basis test to invalidate a Texas statute

7    excluding *undocumented* immigrant children from public

8    schools.  *Id.* at 230.  We see no reason to create an

9    exception to the Supreme Court's precedent that would result

10   in such illogical results that clearly contradict the

11   federal government's determination as to which individuals

12   have a legal right to be here.

13        The Supreme Court has repeatedly announced a general

14   rule that classifications based on alienage are suspect and

15   subject to strict scrutiny review.  As Judge Gilman

16   advocated in his *LULAC* dissent, we should "tak[e] the

17   Supreme Court at its word."  500 F.3d at 542.  Neither the

18   state's reasoning nor that of the Fifth and Sixth Circuit

19   majority opinions' persuades us that creating a third

20   exception to the general rule that alienage classifications

21   are suspect is warranted here.  Therefore, we hold that the

22   subclass of aliens known as nonimmigrants who are lawfully

1    admitted to the United States pursuant to a policy granting

2    those aliens the right to work in this country are part of

3    the suspect class identified by *Graham*.  Any discrimination

4    by the state against this group is subject to strict

5    scrutiny review.

6         The statute here, which prohibits nonimmigrant aliens

7    from obtaining a pharmacist's license in New York, is not

8    narrowly tailored to further a compelling government

9    interest.  As noted above, appellants concede that New York

10   has no compelling justification for barring the licensed

11   pharmacist plaintiffs from practicing in the state.

12   Further, we agree with the district court that there is no

13   evidence "that transience amongst New York pharmacists

14   threatens public health or that nonimmigrant pharmacists, as

15   a class, are in fact considerably more transient than LPR

16   and citizen pharmacists." *Adusumelli*, 740 F. Supp. 2d at

17   598.  Citizenship and Legal Permanent Residency carry no

18   guarantee that a citizen or LPR professional will remain in

19   New York (or the United States for that matter), have funds

20   available in the event of malpractice, or have the necessary

21   skill to perform the task at hand.[16]

---

[16] In *Flores de Otero*, defendants contended that the statute preventing alien engineers from engaging in private practice was

28

1      The statute is also far from narrowly tailored.  As the

2  Court in *Flores de Otero* pointed out, there are other ways

3  (i.e., malpractice insurance) to limit the dangers of

4  potentially transient professionals.  426 U.S. at 606.  As

5  such, the statute unconstitutionally discriminates against

6  plaintiffs in violation of their Fourteenth Amendment

7  rights.

8              *The Supremacy Clause and Preemption*

9      In addition to challenging the New York statute on

10  Fourteenth Amendment grounds, plaintiffs raise Supremacy

11  Clause and preemption concerns.  Although, for the reasons

12  stated below, we are constrained to decide this case on

13  Equal Protection grounds, we nonetheless address these

14  arguments.  We agree with the district court that

15  § 6805(1)(6) "is even more clearly unconstitutional [under

16  the principles of the Supremacy Clause] than under the Equal

---

warranted because of the aliens' transience, which results in
their tenuous connection to the United States.  426 U.S. at 605-
06.  Defendant's claimed that the classification provided
engineering clients "an assurance of financial accountability if
a building for which the engineer is responsible collapses within
10 years of construction." *Id.* at 605.  The Court flatly
rejected any such rationale, observing that: "United States
citizenship is not a guarantee that a civil engineer will
continue to reside in Puerto Rico or even in the United States,
and it bears no particular or rational relationship to skill,
competence, or financial responsibility." *Id.* at 606 (citations
omitted).

29

1    Protection Clause." *Adusumelli*, 740 F. Supp. 2d at 600.

2         "The federal power to determine immigration policy is

3    well settled.  Immigration policy can affect trade,

4    investment, tourism, and diplomatic relations for the entire

5    Nation, as well as the perceptions and expectations of

6    aliens in this country who seek the full protection of its

7    laws." *Arizona v. United States*, 567 U.S. ___, 2012 WL

8    2368661, *5 (June 25, 2012).  Because "discretionary

9    decisions [about immigration] involve policy choices that

10   bear on this Nation's international relations," the Supreme

11   Court in *Arizona v. United States* recently reaffirmed that

12   the federal power over immigration is extensive and

13   predominant.  *Id.* at *6.

14        When Congress occupies an entire field, "even

15   complementary state regulation is impermissible." *Id.* at

16   *9.  But even if Congress does not occupy an entire field,

17   the Court has confirmed the "well-settled proposition that a

18   state law is preempted where it 'stands as an obstacle to

19   the accomplishment and execution of the full purposes and

20   objectives of Congress.'" *Id.* at *12 (quoting *Hines v.*

21   *Davidowitz*, 312 U.S. 52, 67 (1941)).  Specifically in the

22   lawful alien context, the Court has held that "state

30

1   regulation not congressionally sanctioned that discriminates

2   against aliens lawfully admitted to the country is

3   impermissible if it imposes additional burdens not

4   contemplated by Congress." *DeCanas*, 424 U.S. at 358 n.6

5   (1976).

6        The state contends that § 6805(1)(6) does not impose

7   additional burdens not sanctioned by Congress because

8   although the federal immigration law controls the

9   determination of which aliens should be lawfully admitted

10  for the purpose of working in a specialty occupation, it

11  leaves to the states the determination of what

12  qualifications are required to practice that profession.

13  New York cites to the portion of the regulation that

14  provides that "[i]f an occupation requires a state or local

15  license for an individual to fully perform the duties of the

16  occupation, an alien . . . seeking [a temporary visa to

17  work] in that occupation must have that license prior to

18  approval of the petition."  8 C.F.R. § 214.2(h)(4)(v)(A).

19  It argues that this language contemplates, and leaves room

20  for, the state to determine whether an individual is

21  qualified for the profession; according to the state,

22  immigration status can be one such qualification.

31

1    The state's argument misunderstands the nature of this
2    licensure provision.  Federal law recognizes that states
3    have a legitimate interest in ensuring that an individual
4    applicant has the necessary educational and experiential
5    qualifications for the position sought.  But that
6    traditional police power cannot morph into a determination
7    that a certain subclass of immigrants is not qualified for
8    licensure merely because of their immigration status.  That
9    view makes no sense.  As the district court pointed out, it
10   would make "the federal laws creating H-1B and TN visa
11   status . . . advisory" because the federal law at once
12   "indicate[s] that nonimmigrants should be admitted to the
13   country to practice speciality occupations, . . . [and]
14   allow[s] the states to decide whether nonimmigrants (as a
15   class, not as individuals) should be permitted to practice
16   speciality occupations." *Adusumelli*, 740 F. Supp. 2d at
17   600.
18   New York's law "stands as an obstacle to the
19   accomplishment and execution of the full purposes and
20   objectives of Congress." Freightliner *Corp. v. Myrick*, 514
21   U.S. 280, 287 (1995) (quoting *Hines*, 312 U.S. 67).  Through
22   the INA, Congress exercised its immigration power to permit

32

1  non-LPRs and non-citizens to become lawful residents of the
2  United States and to participate in certain occupations so
3  long as they are *professionally qualified* to engage in the
4  particular speciality occupation they seek to practice.  8
5  U.S.C. § 1184(i)(2)(A).  By making immigration status a
6  professional qualification, and thereby causing the group of
7  non-citizens and non-LPRs Congress intended to allow to
8  practice specialty occupations to be ineligible to do so,
9  the New York statute has created an obstacle to the
10  accomplishment and execution of the INA.

11      We are also unpersuaded by the state's other arguments:
12  that the statute does not regulate who may be admitted to
13  the country and that *Toll*'s prescription that states may not
14  be prohibited from imposing additional burdens "when
15  Congress has done nothing more than permit a class of aliens
16  to enter the country temporarily" applies here.  *Toll*, 458
17  U.S. at 12-13.  The state's reliance on *Toll* is misplaced.
18  The Court there only questioned whether a state could impose
19  additional burdens if Congress only permitted aliens to
20  enter temporarily.  It did not hold that states were
21  definitively allowed to impose such burdens.  In this case,
22  Congress *has* done more than merely allow the nonimmigrants

33

1    to enter temporarily.  It has granted them permission to

2    work in certain occupations.  That alone takes this case out

3    of *Toll*'s potential exception.  Ultimately, because of the

4    obstacles posed by the state statute to accomplishing the

5    purposes of the INA, there are serious Supremacy Clause and

6    preemption problems at issue.  *See Arizona*, 2012 WL 2368661,

7    at *6-18.

8        Yet, while we recognize the preemption and Supremacy

9    Clause issues in this case and also the Court's preference

10    that Supremacy Clause issues be decided before Equal

11    Protection Clause claims, *see generally Toll*, 458 U.S. at 9-

12    10, we must decide this case on Equal Protection grounds.

13    The plaintiffs with TN status cannot argue that the state

14    law is preempted because the NAFTA Implementation Act allows

15    only the United States to bring actions against state laws

16    inconsistent with NAFTA.  *See* 19 U.S.C. § 3312(b)(2).

17        In summary, we agree substantially with the district

18    court's well-reasoned opinion below, the dissenting opinions

19    filed in the panel decisions in *LeClerc* and *LULAC*, and the

20    dissent from denial of rehearing *en banc* in *LeClerc*.  We

21    find no reason to create a third exception to the rule that

22    alienage is a suspect classification.

1    As the Supreme Court noted in *Takahashi*, "[t]he

2  assertion of an authority to deny to aliens the opportunity

3  of earning a livelihood when lawfully admitted to the state

4  would be tantamount to the assertion of the right to deny

5  them entrance and abode, for in ordinary cases they cannot

6  live where they cannot work." *Takahashi*, 334 U.S. at 416.

7  New York cannot, in effect, drive from the state

8  nonimmigrants who have federal permission to enter the

9  United States to work.  New York Education Law § 6805(1)(6)

10  is unconstitutional.

11                          **III. CONCLUSION**

12    The district court's order of September 30, 2010

13  granting summary judgment to plaintiffs is hereby **AFFIRMED**.